BRAY v. FLETCHER.

1. STATUTE OF LIMITATIONS—BREACH OF WARRANTY.

The statute of limitations against an action for a breach of warranty under a deed of lands in Wisconsin, given when certain taxes were a lien on the land, begins to run from the date of recording the tax deed, as, under the laws of that State, the recording of a tax deed gives the grantee constructive possession, and amounts to an eviction.

2. SAME—SUSPENSION OF STATUTE.

The statute of limitations against an action for a breach of warranty is not suspended by reason of the grantor's authorizing the grantee to bring suit to clear the title, where the grantee settles such suit without the consent of the grantor.

Error to Wayne; Rohnert, J. Submitted December 2, 1902. (Docket No. 62.) Decided February 17, 1903.

James M. Bray and Leander Choate presented a claim against the estate of George N. Fletcher, deceased (represented by Frank W. Fletcher and Allan M. Fletcher, executors), for damages for the breach of the covenants in a deed. The claim was disallowed by the commissioners, and claimants appealed to the circuit court. From a judgment for defendants on verdict directed by the court, claimants bring error. Affirmed.

*De Forest Paine,* for appellants.

*Russel & Campbell* (*Henry M. Campbell,* of counsel), for appellees.

CARPENTER, J. This is a claim for damages for the breach of covenants. On November 5, 1879, defendants' testator deeded to claimants an undivided 9-16 interest in 65 40's of pine land, situated in Wisconsin. This deed contained a covenant of seisin, covenant against incumbrances, and covenant of warranty. The controversy arises out of certain taxes levied on said lands for the years 1876 and 1877. At the time the deed was executed, these taxes had not ripened into a title, though the land had been sold for the nonpayment of the taxes, and this sale constituted an incumbrance on the lands. A tax deed of 19 of these 40's and other lands was issued to one Joseph H. Porter, September 9, 1881, and recorded September 12, 1881. Four tax deeds of 25 of these 40's and other lands were issued to one William H. Webster, bearing date, respectively, July 8, 1881, July 12, 1881, February 20, 1883, and September 17, 1885, and recorded, respectively, July 8, 1881, July 23, 1881, February 27, 1883, and September 17, 1885. All of these tax deeds are for an undivided three-fourths of the land described in the deed from defendants' testator, so far as they described said lands.

On the 13th of March, 1882, claimants commenced two ejectment suits, one against Porter, to recover the 19 40's in his tax deed covered by the Fletcher deed, and other lands, and another against Webster, to recover the 25 40's in his tax deeds covered by the Fletcher deed, and also other lands. On October 14, 1886, claimants settled their controversy with Porter. They paid him $1,436.89, and received a quitclaim deed of all the land described in his tax deed, and of other land. March 12, 1895, claimants settled with Webster, paying him $25,000, and received his quitclaim deed of all the lands described in his tax deeds, and of other lands. An interest in the tax titles acquired by Webster still remained outstanding. On

May 24, 1886, he had sold and conveyed an undivided one-third of his three-fourths interest to one S. A. Coleman. October 15, 1896, one Julius B. Grunert, grantee of Coleman, commenced a suit against one Jesse Spaulding, grantee of claimants, to recover damages for timber cut from the land in said Fletcher deed, and from other lands. Claimants, having given a warranty deed to Spaulding, were bound to and did assume the defense of this suit. December 12, 1896, claimants served on Fletcher a writing notifying him of the suit, and asking him to assume its defense. To this writing no attention whatever was paid. This suit resulted in a judgment against claimants for $18,500. Under the laws of Wisconsin, the recording of a tax deed gives the grantees therein constructive possession of the land, and amounts to an eviction.

Defendants' testator, George N. Fletcher, died November 6, 1899. This claim was not presented until March 9, 1901. At this time the commissioners on claims had filed their report, and the claim in controversy was presented under an order reviving the commission. The trial court directed a verdict for defendants upon grounds which we are not called upon to consider, as, in our judgment, as hereinafter shown, plaintiffs' claim is barred by the statute of limitations.

It is apparent that the statute of limitations commenced to run as early as 1885, at least, and that plaintiffs' claim is therefore barred, unless, in some manner, the operation of the statute has been suspended. Claimants contend that "the promises and conduct of defendants' testator induced them to refrain from bringing action within the period fixed by the statute; and that he would be, if living, and his legal representatives are, estopped to set up the statute."

Let us examine the promises and conduct referred to. November 5, 1881, Mr. Fletcher wrote Bray & Choate the following letter:

"A letter from Messrs. Finch & Barber, giving me

their opinion of the case, is at hand, and they ask what proportion of the expense I will pay, provided they go on with the case for you. I wish to say at once that I have no disposition to divide the expense with you. If there must be a suit, it is my business to pay it all, but, at the same time, I am not so overflush with funds that I do not care what the expense is. I wish you to engage these men at some fair figure to do the business for me, and I will pay them. See that their charges are fair. And I wish them to include all the lands granted me by the act."

The record does not show that any response was made to this letter, but it does show that claimant Choate showed the same to Messrs. Finch & Barber, and engaged them as attorneys in the ejectment suits which were commenced the 13th of the following March against Porter and Webster. Some correspondence took place between Messrs. Finch & Barber and Fletcher (which is not produced or proved), and the latter paid the former some money for their services in conducting these suits. On January 12, 1885, Finch & Barber wrote Fletcher about the tax litigation, inquiring if he was willing to settle certain suits, saying that another was begun to save the statute of limitations running, and stating:

"We would like to sort of weed out this litigation, and determine it in the principal cases where Bray & Choate are interested, and where the value of the lands is such that it will justify litigation. In the case of *Bray & Choate* v. *Porter*, it is our test suit. Have closed the testimony for the plaintiff, and at the next term of the Appleton circuit will probably get a decision."

September 9, 1886, Fletcher wrote Choate the following letter:

"It is strange that the State should go back on the contract, and then assume to sell the lands. I admit it is better to settle when it can be done finally, but there are too many cases, as I suppose, to admit of it. What does Palms propose to do? I should never have given a warranty deed only as to my own acts, but I did, and expect to suffer."

Notwithstanding this letter, claimants, on October 14,

1886, settled with Porter, as already indicated. Shortly after this, Fletcher declined to make further payments to Finch & Barber towards the prosecution of these suits, and, after this, claimants paid them. We are able to say that this refusal of Fletcher occurred before February 11, 1887, as on that date claimants paid Finch & Barber $1,000 to be applied on their services. Respecting this, claimant Choate testified:

"Finch & Barber notified me at a certain time that we would have to stand liable for their fees, and something to the effect that they wouldn't go ahead unless we did. They didn't say that Mr. Fletcher refused to make these payments. They said they couldn't get the money from him when they sent for it, and therefore I had to make the payment in the Porter settlement at that time."

The record shows no communication between the parties from this time until June 2, 1893, when Fletcher wrote Finch & Barber (it is evident that this letter is a reply to a letter from Finch & Barber, and their letter is not produced), as follows:

"I had hoped that all these perplexing matters had all passed into oblivion. B. & C. must have made a big thing in their purchase, while I was the loser. The great increase on the lands and the worthless claims, against all justice, leads me to decline paying anything more."

June 27, 1893, Finch & Barber wrote Fletcher as follows:

"Your valued favor of June 21st received. * * * You are aware that we settled the most important part of it [the litigation], taking up the certificates and obtaining a quitclaim deed from one Joseph H. Porter and others. There is still, however, a suit pending in the name of Bray & Choate against W. H. Webster and others, in which the validity of your title is involved, and in consequence of several tax deeds that were taken out on account of the nonpayment of the taxes for 1877 and 1878. I submitted your letters to Messrs. Bray & Choate, but they seem to think that under the arrangement you made with them, and under your warranty, and under the letter you wrote to us, in which you directed us to clear up the title, you

ought to co-operate with them in removing this cloud from the title. They say that this land has been tied up for a number of years on account of this litigation, that it has been exposed to fire, that fire has run through it, and that they are willing, with some loss to themselves, to do what is right so far as you are concerned. I have been in hopes that they would be able to make an amicable settlement themselves with the parties who hold these tax deeds. and have urged Mr. Choate to see you personally and explain to you in detail just the condition of this litigation. * * * Mr. Bray, a member of the firm of Bray & Choate, is in poor health, and for that reason I think Mr. Choate would like to get the matter off his hands. I have told him repeatedly that I had no authority to make any arrangements for you, that I was simply your attorney in this matter, and that you felt that your title was good, and that if the litigation was pressed to a final termination we would be successful. The great trouble is that there are so many points involved, and that the litigation is so expensive on account of the different questions that arise, that we have not forced the cases to a trial. as we would have done, hoping that Bray & Choate would effect a settlement themselves with these parties. We have protected you by bringing these suits and keeping them alive, in order that no question of the statute of limitations might be involved. It is our advice that you either force this litigation, or that you endeavor to make some arrangement with Mr. Choate whereby you will in the future be relieved from all possible liability in respect to the same."

(It is probable that this is in reply to the letter of June 2d, therein referred. to as June 21st, though Mr. Barber thinks the letter is in reply to one from Fletcher asking for information about the suit.)

July 20, 1893, Mr. Fletcher wrote Finch & Barber as follows:

"I have written B. & Choate, and when I hear will write you again. In Nov., '81, you wrote you had closed the Palms and my suits, beating the Oconto claimers; and, under this as a precedent, why not close these? Palms and I were contractors, but were subcontractors. Did you attempt to set the deeds aside from defects in taxing by terms outside of the lands? Could not the State be made

to father these suits and costs, for unfair taxing lands exempt? As I read, the law says when a deed has been given and recorded nine months, and the lands were subject to taxation, then it was barred. Are these lands subject to taxation? If Taylor gained his case in U. S. courts, could we not, for same reasons? This suit was commenced in Choate's name. Why not press it for a close, and have it for C. and I to arrange after?"

No reply is shown to have been made to this letter. Claimant Choate testified:

"I don't think I have any other correspondence from Mr. Fletcher on the question in controversy in this claim, other than the letters I have presented. I think there was a letter previous to that that I handed to the attorney. It don't seem to be found. I might have received a letter from Mr. Fletcher from November 5, 1881, to September 9, 1886, upon this question. I think there was one letter came before the date of any of these. I think there has been some since September 9, 1886, but that is all that I could find."

Does the testimony warrant claimants' contention that they were induced to refrain from bringing the action within the period fixed by the statute? It is to be observed that this testimony is most unsatisfactory. The entire correspondence is not produced. Fletcher's letter of June 21, 1893, which was shown to claimants (if it was not, as we suspect, the letter of June 2, 1893), is not produced; and it is a very important letter, because it indicated his position respecting the pending litigation. Nor is Fletcher's letter written to claimants, which presumably indicated his position respecting the pending litigation, referred to in his letter of July 20, 1893, produced. Nor is the letter of Finch & Barber, which drew out Fletcher's letter of June 2, 1893, produced. We think no inference can be drawn from this testimony which warrants claimants' contention. They contend that, as Mr. Fletcher promised to pay the expense of litigation to test the tax titles, he could not, while that litigation was pending, claim the benefit of the statute of limitations. It may be doubted if Mr. Fletcher authorized the suits actually commenced and car-

ried on by claimants.   Mr. Fletcher's letter of November
5, 1881, authorized claimants to institute suits to test the
tax titles on the lands sold by him to claimants, and on
other lands of his.   The suits commenced omitted all other
lands of his, and included other lands of claimants.

But assuming, without deciding, that the suits com-
menced were authorized by Mr. Fletcher, claimants, in
settling the suit against Porter in 1886, put an end to the
agreement.   It should be stated that Mr. Fletcher obtained
his title to the land conveyed to claimants by a patent
from the State of Wisconsin in 1871, which not only con-
veyed the land in question, but also other land.   At this
time an act of the legislature of Wisconsin exempted the
land from taxation.   It was Mr. Fletcher's claim that, by
virtue of this act, the land was not subject to taxation in
1876 or 1877.   The correspondence shows Mr. Fletcher's
wish to "include in the suit all the lands granted him by
the act" (patent); and that the Porter suit, as shown by
the letter from Finch & Barber of January 12, 1885, was
a test suit, in which Fletcher, as the owner of other lands,
had a special interest.   Mr. Fletcher, as shown by his
letter of September 9, 1886, was opposed to the settlement
of the Porter suit.   Yet notwithstanding Mr. Fletcher's
interests, and in opposition to his request, claimants set-
tled the Porter suit.   This was a breach of the contract by
which Mr. Fletcher had agreed to pay the expense of
prosecuting these suits.   Had a suit been brought at once
by the claimants against Mr. Fletcher, he might have
been liable because of the covenants in his deed, but he
would not have been liable upon the agreement under con-
sideration.   The claimants' failure to prosecute the suits
as agreed would have afforded a complete defense.   Is it
possible that the claimants, having thus broken the con-
tract upon which they rely, can now take advantage of
that contract to prevent the running of the statute of limi-
tations?   This question admits of but one answer.   They
cannot, unless the subsequent conduct of Mr. Fletcher
indicates that he proposed, notwithstanding this breach of

the agreement, to abide by it.   It may be demonstrated from this record that his subsequent conduct is inconsistent with an intent to abide by this agreement, and is consistent only with an intention to disregard it.   After this date he refused to make any further payments towards the expense of this litigation.   But it is claimed the correspondence in 1893 indicates an intention to abide by the original agreement.   This intention is certainly not found in the first letter written in that year, namely, the letter of June 2, 1893, for in that letter he declines paying anything more.   It cannot be found in his letter of June 21st (a letter not produced, and which may be identical with that of June 2d).   We can infer the contents of that letter from the following statement in Finch & Barber's letter of June 27th:

"I submitted your letter to Messrs. Bray & Choate, but they seem to think that under the arrangement you made with them, and under your warranty, and under the letter you wrote to us, in which you directed us to clear up the title, you ought to co-operate with them in removing this cloud from the title.   They say that this land has been tied up for a number of years on account of this litigation, that it has been exposed to fire, that fire has run through it, and that they are willing, with some loss to themselves, to do what is right so far as you are concerned."

Two things are obvious:   *First*, Bray & Choate insist upon more than Mr. Fletcher offered in his letter of June 21st; and, *second*, even they do not insist upon his carrying out the original agreement, but are willing to stand part of the loss themselves.   The missing letter of June 21st (if it is missing) certainly did not indicate an intent to carry out the original agreement.

Great reliance is also placed upon Mr. Fletcher's letter of July 20th, which concludes as follows:   "This suit was commenced in Choate's name.   Why not press it for a close, and have it for Choate and I to arrange after?"   Does this mean that, when the suit is ended, Fletcher will settle with Bray & Choate according to their legal rights, or that he will pay the expense of the pending litigation?

Clearly not. The language is a mere inquiry. The letter abounds in inquiries, to all of which, including the one under consideration, an answer is desired. Even if this language amounted to a proposition, it cannot be taken as granting more than claimants had demanded; viz., an agreement that Fletcher should bear a part of the loss. But whether this was an inquiry or a proposition, it was never accepted or acted upon; for the suit then pending, —the Webster suit,—instead of being pressed to a close, was settled without any consultation with Mr. Fletcher.

We conclude, therefore, that nothing transpired, after the breach of the contract by the claimants in 1886, from which an inference can be drawn that Mr. Fletcher chose to abide by such contract, and that the claim asserted in this suit is, therefore, barred by the statute of limitations.

The judgment of the court below is affirmed.

The other Justices concurred.